May it please the court, good morning. My name is Nicholas Tepper. I represent the appellant and the plaintiff in the underlying trial action, Keith Chung. There are two genuine issues of material fact that I think the court at the trial level failed to recognize that I think apply to all three sets of the defendants in this case and almost every issue presented in this case. The first clearly is whether or not the items seized. I think we must recall that the items that were seized were the entire inventory of this man's store. That those items seized. I thought they only seized things out of the front of the store. No they seized, the the record is that they seized $350,000 of his inventory and I can attest that that was, although it's not in the record because it's now driving a taxi. So what they did is based on completely incompetent and relying on completely incompetent statements from third parties who are co-defendants, went in and arrested him, charged him and seized all of his property. And part of the moving papers for the motion for summary judgment to evidence saying that those photographs of documents were never in his store. And the evidence further in support of that claim was declarations and invoices from his supplier saying we didn't sell him that stuff, we sold him this stuff. Well that was just one supplier. Pardon me your honor? You had a statement from one supplier as I understand it. A supplier, excuse me if I misspoke your honor. How about the other supplier? Well the burden was on the moving party and there's another piece of evidence as well your honor and that is the marks in the that they placed in the So when you add up all these things and you add up the very high standard the moving party has to meet and you and you take into account that the doubts, any doubts regarding the evidence is supposed to be resolved in my party's favor, that inferences drawn from the evidence are supposed to be viewed in the light most favorable to my client, all those things at least raise a rule that my guy wins. We're just asking for to have his day at court, just asking to have a trial. Why is the statement of one supplier that he hasn't supplied any counterfeit goods prove anything? Well it doesn't have to prove anything your honor, all it has to do is raise a genuine issue of material fact. What's the issue of material fact? Whether or not the documents and the so-called goods that they took from his store that they alleged to have taken from his store and attached to their motion for summary judgment were in fact goods taken from his store. Beyond the supply... How do we know they took any goods supplied by this supplier? We don't your honor and that's an issue of material fact that should be adjudicated by the trier fact but there are other things that support that conclusion. There's the testimony of the declaration of the appellant's wife who was in charge of buying all of the goods. She clearly states under penalty of perjury I never bought these goods. These goods were never in my store. We never sold these goods. That in and of itself should be enough. Do we have a deposition from Mrs. Chung or just the declaration? I believe just the declaration. Correct. So the other side never took her deposition? I wasn't the trial attorney your honor. When you're not going to take a deposition of your own witness, the other side did not take her deposition. I guess I can ask them. But in any event if they had taken a deposition and she had said yes we sold those goods and then she presented a declaration in opposition to the MSJ saying we never sold those goods, obviously that would have been something that they would have raised in their brief and they didn't. So we have these a multitude of facts your honor. It's more than just that there's one supplier saying I never sold them these goods. It's that you have the appellant and his wife who helped him run this business saying we never sold these goods. That should be enough. We never sold the goods that are now being presented as counterfeit. Correct. In support of the MSJ. Now when the motion for summary judgment is made, when they say we never sold these goods, were they permitted to inspect the goods? Yeah, they inspected the goods. That's how in their, at least some of the goods, I mean there's $350,000 of T-shirts and shoes I suspect is a lot of goods. And I believe in her, the record in her declaration they stated that these, after inspection, that these goods did not have these marks. They marked all of their goods specially so that if someone tried to return something they could ascertain whether or not it was in fact their goods. Yeah, she said she put the marks in an incompetuous place with the date of her birthday at an initial. Correct. And that these goods that were in, that were being alleged in support of the MSJ didn't have those marks. The second issue... And did the other side say that they did have the marks? No. They didn't say they had the marks. So there's no dispute as to whether or not they had the marks or not. The other side is not saying they did. The other side is not saying they had the marks. So I guess the other side is saying she must be lying and that she put the marks on? I mean... And if they're saying that, that's an issue for the trier fact to decide. It's not an issue that should be properly adjudicated on a motion for summary judgment. Even if we didn't have that issue, we have this second issue, which is were the goods that were seized, even assuming arguendo, that the goods that were attached to the motion for summary judgment, the pictures of the goods attached to the motion for summary judgment, even if those were in fact taken from their store, were they counterfeit? Now, we'll get into this other aspect of the case, but they had not one but two chances to have expert witnesses state that the goods were counterfeit, but not only just state the goods were counterfeit in a conclusory fashion, which is all they did, but to also state the basis upon which they made that determination. They had not one but two chances to do that. And they failed both times to have any experts do that. They had people who said we took a class and that the goods are counterfeit. You say people. Who are you referring to when you say people? Excuse me. I'm saying the expert declarations that are in the record that were in support of the motion for summary judgment brought by the three groups of defendants. Our expert, Goldapper, testified there's a basic minimum test, and that is you have to have the alleged counterfeit good in hand with the genuine article and compare them. Now, that assertion that that is the basic minimum standard for being able to ascertain whether or not these products were or were not counterfeit is uncontroverted. There's no expert that ever said this is not the way to do it. And she talked about things of comparing the label, comparing the stitches per inch, et cetera. And she said it is impossible, no matter how expert you are, to be able to pick up a good off a shelf or look at it off the shelf without comparing it to the genuine article and determining whether or not it was or was not counterfeit. Now, it is uncontroverted that that's the basic minimum standard, and it's also uncontroverted that the defendants never had an expert who did that. Well, she didn't say the goods were not counterfeit either, so it doesn't directly contradict what the defendants put out. Well, but what it does is it renders their allegedly expert opinions that they were counterfeit as invalid. Because grounds for impeachment, that's true, but I don't think it goes beyond that. Right. And I think at that point, Your Honor, I don't think that she inspected the goods herself to render an opinion. All she was and her testimony was offered for was that the alleged expert opinions proffered by the defendants, not once but twice, could not be considered because they did not meet the minimum requirements. It would be as if, and I realize that arguing by analogy is not the best way to proceed, but as if an expert was offered his medical opinion about someone's condition without reviewing their medical history or the chart that's at issue or the medical records, something like this. These so-called experts were not experts, and that is what Goldapper's... Now, again, you say these so-called experts. Give me names. What experts are you talking about? Latifee was one expert that was presented by the intellectual property of Fernandez experts. And they're in the record, Your Honor. I don't have all of them here, but I remember Latifee, and I have this note. That's okay, then. Don't detain yourself. Okay. And there's another interesting fact that I think raises an issue, a genuine issue of material fact or that supports these two genuine issues of material fact. One, whether or not the goods were actually taken, and two, whether or not they were counterfeit. And that is that they took $350,000 worth of my guy's product. They arrested him and charged him, but they never prosecuted him, and they didn't prosecute him for lack of sufficient evidence. So here you have that fact with all these other facts, and you have the defendant standing up and saying, well, we reasonably relied on these experts who our expert has proved didn't use the minimum standard of holding one article with a genuine article and comparing them. And they're saying, well, these are counterfeit, but then you have the city saying we're not going to prosecute because there's no evidence. Those things don't jive. And when you add all this together, what you should conclude in your de novo review is that my client should have his gain court. He should be able to stand up and say, I woke up, I went to my store, I opened the doors, and at the end of the day, my business was ruined and I was arrested. I was never tried. They dismissed the case. I never got any of my property back. Now, why didn't he get any of his property back? I can't answer that. Well, did he make a request for it? I don't know if he made a request for it or not. But I know that he hasn't gotten it back, and I know that he hasn't been able to have someone determine whether or not that property was the property taken from his store, and whether or not that property was counterfeit or not. And that's really what I'd like to impress upon the court, is just allow him to be able to stand up and present his evidence. I think it's clear that there are genuine issues and material facts. Those two issues implicate everything. And there are two more issues I would like to raise. And that is, it was not right, the district court was not correct in saying, I deny your motion. He was correct in saying, I deny your motion. But he was incorrect in saying, here is a roadmap of how to fix it. And I'm going to give you seven days. And I'm not going to allow any memorandum of points from the authorities or any argument in writing, other than if you want to retort what declarations they have. And then they submitted three identical depositions, declarations. Right. Exactly right. And the problem was, is that even when the judge did this and allowed them more time, and I cited all the law about how under due process, every moving paper, every argument, every evidence has to be in their moving papers, that the trial judge still got it wrong. The issue was not whether or not the arrest was legal. The issue was whether or not the seizure was legal. And then they presented more basically identical declarations saying, we think that these were counterfeit, but they don't give a basis for why, and they don't address what they already knew, which was our experts saying that you had to compare the genuine article. And they didn't have any basis for saying that it was counterfeit or not. So that was wrong. Well, the judge could have granted summary judgment to his body, couldn't he? Well, but he could have, Your Honor. He could have. But the problem is he actually granted my clients, he actually denied their motion for summary judgment. He denied it, properly so, and then said, here is exactly what you need to do in order to grant, to have this granted. That was not, that was violative of my client's due process rights, and that shouldn't have happened. I guess the other issue is brief, and I'll just, I'd like to reserve my last minute, but it's basically on the fourth and fifth causes of action for negligence. There is a triable issue of factor about whether or not my client, whether or not the Government Code 911.2 applied with regard to the six months. He was facing these criminal charges, and as such, under Government Code 945.3, there was a tolling of the statute, and there's an issue as to whether or not he filed within six months after that case was disputed, or sorry, whether or not that case, when the criminal case was dismissed. When the criminal case was dismissed, then you have the six months. And what the court ruled was it was six months from the date of the arrest, or the date of the seizure, and that's not correct. So with that, I would reserve. All right. Thank you, counsel. We'll hear from, yes, we have both government and private defendants. Have you allocated your time? Yes, we have, Your Honor. We're going to split it evenly, and I'd like to reserve two minutes of my time for after. All right. I'm sorry, just so I understand, evenly among three, evenly between two? Evenly among three. Okay. Five, five, and five. Okay. Thank you, Your Honor. Amy Field, Deputy City Attorney on behalf of the City of Los Angeles and the Los Angeles Police Department officers named in this suit. Good morning, Your Honors. I'd like to address some of the things that counsel has raised. First of all, the question of whether the items that were actually seized from Mr. Chung's store that day are the same items that were booked into property and are currently being stored are the same is not an issue that's material to this lawsuit. This lawsuit raised two claims under Section 1983. Was Mr. Chung unlawfully arrested in violation of the Fourth Amendment, and was the merchandise from his store improperly, unlawfully seized? Well, I think it's relevant to the second one, and that is if the merchandise that you're now saying was seized from the store is not, in fact, the merchandise that was seized from his store, that seems to me, and I don't know whether that's true or not, but if, in fact, you're now showing merchandise that was seized from some other place that is counterfeit, and he says, yeah, but you seized other stuff, and that wasn't, I mean, that clearly goes against your client. So I think it's relevant. Well, I disagree, Your Honor. I think that ---- I mean, it may be somewhat difficult to believe that that's true. But if true, it would be relevant. Well, and I would disagree, Your Honor. First of all, obviously, I would argue that that's kind of a difficult proposition to believe, given how this is all documented. Yeah, that's a different question. But as to the second issue, I think it is irrelevant, because what it would be relevant to is when the police seize property from somebody, they do have a responsibility to maintain control of that property until it's released back to the person by the court, or they're told that they can't have it back. If what Mr. Chung is saying is you've now destroyed the property you seized from me, I think there's the potential out there for some kind of due process claim that he could make. However, that's not what he asserted in his complaint, and he's never amended his complaint to assert such a due process claim. So I would argue it's not before the court. Okay, well, you can decide that they're relevant or not relevant. Let me ask you this. What do you know about any price fluctuations in the retail price of these shoes? Do I pronounce it bapes, bapees? Do you know how to pronounce it? I have never heard of these shoes. You're going to need to look them up. Yeah, I've never heard of them. They're kind of a tennis shoe, right? Yeah, that's my understanding. The bathing ape mark from Japan. I would assume that as with every other piece of trendy fashion, the value of it goes up and down depending on what's in fashion now. I mean, what's in fashion one day and worth a fortune, because every kid wants it, you know, two months later nobody wears it, and it's not worth much of anything. It's just an object that serves a purpose at that point. It doesn't have the fashion value anymore. So we don't know. Yeah, yeah. So we don't know. So counsel said that the property's not yet been returned even though no charges were ever filed? That's correct. That's my understanding is that it's still in storage. Why is that? That counsel can, you know, follow the necessary statutory procedures and seek return of that property. That's been an avenue of relief that's been available to him from day one, and that's something between plaintiff and the state courts. It's not as if my client can just hand over the property to him. It's a decision he needs to seek return, and there are statutory procedures that he has available to him that he has not availed himself of. If they are in fact counterfeit, would he be entitled to their return? You know, we were talking about that. I don't know. I mean, perhaps he would be entitled to their return with a, you know, provision that he's not allowed to sell the property. He certainly can't get it back and, you know, open up a storefront and put it up for sale again. But, you know, if he wants to give it to his family members or you know, I think he just can't profit from it is my understanding. And let me make sure I understand. You're representing the city and the city individual defendants? Correct, the police officers. The police officers and so on. You know, it doesn't smell right to me. Those, the various declarations we get out of the officers, they're somewhat internally inconsistent. And then to the degree that they're consistent, they're identical. Only after they get a road map from the district judge do they finally write them and then they come in. I mean, they have trouble with. I think that the corrections that were made when the supplemental declarations were submitted were so minor. I think the original declaration. Yeah, but even before the corrections were made, we get different statements as to who went in, who stayed outside. I mean. I disagree, Your Honor. I think that their, you know, their rendition of what happened that day has always pretty much been the same. I think the original set of declarations were kind of inartfully drafted. They were written in the present tense, what the officers know now, today, the date they signed the declaration. And as Judge Matz pointed out, what was relevant is what they knew the day they arrested Mr. Chung and the day they seized his property. That's right, and that's what bothers me because, you know, if they should, certainly counsel should know that. What was relevant was what the officers had reasonable cause to believe on June 21. And I'm really, I mean, I question whether they actually did have reason to believe that there were experts in counterfeit merchandise whose statements they were relying upon when they went in to the store. I mean, why not, if that is true, why not say it the first time? Again, Your Honor, I really don't think it's anything more than an inartful drafting of a declaration. And should that have happened? Absolutely not. But it happened. I don't think there has ever been any evidence to dispute that, and I'm forgetting the name of the initial sergeant that communicated to the officers involved in this case. One of them got a tip. Somebody who's not a defendant in this case got a tip that Mr. Chung was selling counterfeit goods out of his store. He got the tip from, I'm sorry, I'm having a hard time with the names. I think it was Mr. Fernandez. He then communicated to his fellow officers, look, this guy, Fernandez, is an expert in the field. We rely on him all the time in law enforcement. He conducts training on the identification of counterfeit goods. He is a reliable witness. That was communicated to all the officers that participated in the actual arrest and seizure. Was that in the first round of declaration? I believe it is, Your Honor. I'm just asking. Yeah. Okay. And the other question I have about that factual matter is, so the Bapes tennis shoes, the Fernandez person who gave the tip, his client was Bapes. And so, I mean, is that what led him to go into the store and say, oh, I recognize that there's Bapes shoes here or counterfeit Bapes shoes here? You mean before he contacted the police or on the day of the...  Was he investigating on behalf of Bapes? I think that's correct, Your Honor. I think he works for several trademark holders and reports when he sees what he believes to be counterfeit goods being sold at stores, swap meets, you know, the places where this stuff is sold. So he's not disinterested. I mean, he's got a client or several clients here. Yeah. I think that's correct, Your Honor. Yeah. So again, I really... I think you've taken up more than your fair share of time. I think I have. Thank you. Good morning. May it please the Court, my name is William Polaris and I represent the appellees, Brand Security, along with Heather Holdridge. And I just want to briefly bring back the Court that the issue here in this case is basically whether Brand Security and Heather Holdridge negligently provided false and misleading information to the police resulting in Mr. Chung's arrest and seizure of the property. So we have to look at what was the communication made to the police and whether or not Ms. Holdridge or Brand Security had a reasonable basis for that communication. And with respect to the latter issue is whether or not the goods were actually counterfeit or not. Ms. Holdridge provided declarations. She had an investigator go to Mr. Chung's shop. They purchased a Nike pair of shoes, which was determined to be counterfeit. A letter of cease and desist was sent to Mr. Chung. He ignored it. Then there was therefore a report to the police department that there was counterfeit material being sold from Mr. Chung's store. And that's what led to the investigation of which Ms. Holdridge and Mr. Fernandez of IPEC also participated in that investigation. On that day, I forget what day it was, I believe it was in June of 2006, they went, purchased another item, which was the Bapes shoes. And Your Honor's questions about what are the price differences, that Bapes I think commanded prices well above $100 for a pair of shoes. And do you know, have the prices remained more or less constant? I don't know whether they remain constant. I know that they were very fashionable and some of this material, and it was completely unknown to me, for example, a pair of jeans could go up to about $500 for a pair of jeans, some of this product. And that clearly Mr. Chung was not selling this merchandise for that price. I don't know whether it fluctuates or not. I can't answer the question. But based on an item that was purchased from Mr. Chung's store, I believe on June 21, 2006, by an L.A. police officer, it was then brought to Mr. Fernandez and he identified it as counterfeit. And did he have any genuine Bapes shoe to compare it to at that time? I don't believe he did. And that really is a question of what you're getting to in Ms. Goldapher's declaration as to what is the standard to make a determination of counterfeit items. And that is not really irrelevant because my understanding is that these investigators go off day in and day out. They don't have comparative product there. They don't sit there and hand them both side by side. They can tell by labeling, by certain stitch in the product. They have certain ways of just determining. Is that a disputed issue of fact? I mean, it does seem to be contradicted in the evidence how. I mean, intuitively, I find what you're saying to be correct. But it seems like would there need to be a finding of fact that it's not required to bring in this product? I don't believe there needs to be a finding of fact. Your question is somewhat like the other justice indicated, was it somewhat impeachment, whether or not that is, you know, somehow that you actually employ that system or not to come to your conclusion. The conclusions must be the issues of finding the facts are, A, is there somebody that's saying that the goods were counterfeit? And on the other side, which was plaintiff's burden, is there someone saying that the good is not counterfeit? Or, alternatively, that these were the types of goods that were seized from my store, and here's an expert that could give a sample of those goods that I had, and that expert reviewed those goods, and that expert determined that those goods were authentic, which would leave a court to conclude, well, there is a trialable issue of fact as to whether or not certain goods are. Let me ask you this. Was the entire inventory of the store seized? No, it was not, Your Honor. How much was seized? I don't know how much, but there was a number of products. Why don't you know? Well, I mean, because there's literally hundreds of jeans. I mean, I could go back on the record and tally up the number of jeans. I can tell you how much product was seized with respect to my client's trademark. Well, you have it in several declarations. What is the exact number? It's just you don't know as you stand there. I just don't know the exact number. There's an inventory report which my client stated in declaration that she produced at the time of the seizure, okay? And then she drafted that. That became part of, I believe, the police report. Well, what I'm trying to figure out is how much material was seized from the store and over how long a period. That is to say, if the entire front of the store were emptied out in an hour, that's one thing. If the front of the store were emptied out after two days, carefully inspecting each little stack to see whether it's counterfeit, that's another thing. No, there was approximately, to give you, Your Honor, any idea, there was two pallets worth of merchandise seized. And how long did the seizure operation take? I can't imagine that the seizure operation took more than three hours. It was basically you went into the store, certain items were identified. There was a videotape, which I believe was presented in the record, and that certain items within the store were identified as counterfeit. Those items were seized, taken outside of the store, inventory, and then packaged up and taken away. What are we to make of Ms. Chung's declaration, Mrs. Chung's declaration, where she says, I make these marks in inconspicuous places with the 96, which is my birthday plus an initial, and she says, they aren't on any of these pieces of merchandise that I've been able to see, that they're purportedly the merchandise that's been seized. Well, let me just first explain. A lot of the evidence that was presented by plaintiff is not connected. Number one, Mrs. Chung never inspected the items that had been seized. Only Mr. Chung did. And Mr. Chung never said that he did not sell big shoes, he did not sell Nike. He was simply saying that the items produced for inspections, those weren't his because his wife marks them. Mrs. Chung never saw any of the items. Also, Mrs. Chung Let me get, so are you saying that the seized merchandise does or does not have the markings? I'm saying, well, to be honest with you, there are some, a couple products I believe that do have the markings. And how do you, and what's the basis for that statement? The basis of that statement is I was at the inspection and that Is there something in the record that supports that statement? I don't believe there's something in the record that supports that. I don't know if Ms. Holdridge testified to that or not. I can't point to you that. I mean, I read her deposition. I didn't see anything to that effect. You probably didn't. But basically, I don't think Mr. Chung is not saying that he didn't sell Bapes or he didn't sell Nike or that he didn't sell Major League Baseball. What Mr. Chung is saying is that the items that were produced for inspection in September, I didn't sell those because my wife usually marks things. She said she always did. She always marks things. That's what her declaration says, not usually. She said always. She always did. But she also said that she buys from the supplier and the supplier says that he only sells Dickies to Chung. And so you have Mr. Chung not denying the fact, he doesn't deny that he sold Bapes or Nike. No, no. I mean, the supplier sells them and he says they're legitimate and you say they're counterfeit. Mr. Chung has presented no evidence whatsoever that he sold legitimate Bapes, that he sold legitimate Nikes, that he sold legitimate Major League Baseball, that he sold legitimate NFL or legitimate Chiefs. Mr. Chung, who has that information, has the resources to get that evidence, presented no evidence that he sold legitimate items for those trademark holders. Now, why do you say no evidence? Are you just saying that Ms. Chung's declaration is not evidence? It's not evidence. It's not evidence because it doesn't go to show that Mr. Chung sold legitimate Nikes and that those legitimate products were seized improperly. Ms. Chung's declaration is not relevant at all. Well, what about this? What about this? What about this? Excuse me. I'm sorry. There's a declaration by Hector Gutierrez where he says that he took from the store 60 Fat Farm jeans and Ms. Chung says she's never sold Fat Farm jeans. She never sold? And then Mr. Chung never, and then she, Mr. Chung never stated that he didn't sell Fat Farm jeans. Well, but she said that. She was the. She also says she never sold Vapes. And yet part of the complaint is that Vapes tennis shoes were seized from her car. Okay? And that's on the record as well. Now, who says she never sold Vapes shoes? I'm sorry. You said she says she never sold. She says she says. She's saying she never sold the. Who's she? Mrs. Chung. She says she never sold Vapes shoes? She's saying she never sold. In other words, they didn't sell those shoes and those trademarked. Where does she say that? Well, I'd have to go back in the record. I know that she. Well, I've got the declaration right here. I can't find that statement. Does she only say she never sold Fat Farm? Yes. Okay. Then, but we're going back. We're kind of. Where is it that she then produces evidence that she sold legitimate Vapes shoes? Where is it that she presents evidence for purposes of my client that she sold legitimate Nikes? Or legitimate Major League Baseball? Or legitimate NFL? Or legitimate Chivas? Where is that evidence? That's what the basis of brand security and Ms. Holdren's summary judgment motion is. Is that those Nike items were seized. And they were counterfeit. Now, it's up to plaintiff, Mr. Chung, to present evidence. No, we sold legitimate Nikes. We sold legitimate product. Nothing is ever presented in the underlying matter that counter or contradicts the evidence presented. We set the burden. We showed that the items that were inspected, that were seized, were counterfeit. And all Mr. Chung says is, well, the items I inspected on September, those items weren't in my store. Okay, so where's the evidence that you sold legitimate items? Where's the evidence that you sold legitimate product from Nike? I don't know if that's what he asked to show. I mean, we're talking about whether your clients provided intentionally or negligently false information to the police on which they used to seize. So it's sort of more of a mens re. No, she only has to have reasonable good faith belief if she believes that those products were counterfeit. She communicates that to the police. Okay? Where's the negligence? I mean, that's why I'm saying whether or not they're counterfeit. We're talking about what the state of mind was. Does she believe that they were counterfeit? And he has to come in and say there was just no reasonable basis for her to conclude that they were counterfeit. Okay. Counsel, you're well over, and I think we have your issues. Do you have something that you need to add? Now, who do you represent? I represent IPEC and the Fernandez brothers, Your Honor, if I may have one minute. Okay. IPEC and the Fernandez brothers. Okay. All right. Thank you, Your Honor. Whatever you want to do. May it please the Court, I'm Ken Cato. I represent IPEC and the Fernandez brothers. We were sued for negligence. That's a reasonableness standard. Did we have a reasonable belief in providing this information to the city that the goods were counterfeit? The declarations clearly provide that reasonable belief. Even if you don't believe that, these are absolutely privileged statements under Section 47. Secondly, we were sued for conversion. Conversion means we have to exercise dominion and control over those goods. We don't. The city does. We hold those goods for the city. And this is just a question of straightforward California law, and I'm not sure on the point. Does someone, in order to be guilty of conversion, have to hold the goods himself or merely to have facilitated the illegitimate holding of the goods by somebody else? They have to exercise dominion and control over themselves. If you're a Bailey, you're holding it for somebody else. We hold it for the city. We can't do anything with it until the city tells us to do it, and the city says. Was there no moment at which your client held dominion and control over this property? No, Your Honor. The entire complaint, a plaintiff, in fact, is that the city unlawfully seized it. We seized it at the direction of the city. That's the way these things work. The private investigators go out. They say take this. We say it's counterfeit. They say, okay, take it. Seize it. You're seizing it on our behalf. Do you know anything about the price fluctuations of the Bape's shoes? I am the least fashionable person in this room, Your Honor. You've got some competition. All I know, Your Honor, is that Mr. Fernandez, in his declaration, tells you that he's been doing this since, I believe, 1991 and has had 15,000 hours of training from various manufacturers, and he's the one that says, look, you go buy legitimate Bapes, they're $210. You go buy knockoffs, they're $70 or whatever it is. They went in, they bought something, they didn't charge them $210, they charged them $70. Fernandez says, all right, I think I got a hunch. Let's see him. He looks at him. He applies the training that he received from Bapes and says, those are counterfeit. Is that reasonable? Is it privileged under 47? We think it's both. And there's no disputed issue about those two things. Thank you. Thank you. Our expert delineated several factors, and I'm quoting from an excerpt of record from her declaration at 1049. Among the things that are examined are the way the items are sewn, number of stitches per inch, seam allowances, the placement of pockets, logos, and other ornamentation, labels, quality, and fiber content of the fabric, along with the overall construction of the item. What is missing? Price. That's what he just said. His expert went into the store, saw that it was a lower price, and based on that and his many years of experience determined that these were counterfeit. That's not one of the criterion. That's obvious, isn't it? No. This is a $1,000 suit, Your Honor, that I went down to Nordstrom Rack and bought for $300. It's a Nordstrom Rack suit right here. Look, it's a Hickey Freeman suit. I can see it's a knockoff from here. No. I appreciate your honor. It's a Hickey Freeman suit. It's not a knockoff. It's the actual genuine article, Your Honor. And instead of looking at the price, their expert would have examined the cloth, which is very fine, and the sewing pattern, which is consistent with the Hickey Freeman suit, which is a very, very fine suit, Your Honor. I'm very familiar with Hickey Freeman. Exactly. I usually pay full price. That's one of the reasons why price is not an indication. And here's the other thing. I'm going to just drive this point home one more time. Basically, what the defendants are saying is that counterfeit apparel is like pornography. They know it when they see it. That famous case, I don't remember it, the Supreme Court case where they sat in the bowels of the Supreme Court and they looked at it, and they know it when they see it. That is not the case with counterfeit apparel. You can't look at it and say, I know that's counterfeit. You can't take three pallets in three hours and determine that all of those things, and Your Honor was right on with that, take all of those things and just say, counterfeit, counterfeit, counterfeit, counterfeit. You can't do that. And in none of their declarations did they ever retort what our expert said the minimum was. And that means there's a genuine issue of material fact. Did they act reasonably before entering my client's store and seizing his property by just having an expert say the price is too low? And that absolutely was unreasonable. It raises a tribal issue of fact that we should be allowed to have our day in court with. The first attorney who argued for the city specifically said that in response to one of Your Honor's questions, this is a question that is hard to believe the conclusion about. And she also talked about something being inartful, the declarations being inartful. There's a difference between being inartful, such as my oral presentation today, and being insufficient. Inartful is not insufficient. Their declarations were insufficient. There's a tribal issue of fact about whether or not these defendants as a whole, and acting in concert, were reasonable in determining that they could go in and seize my client's property. The fact he was never prosecuted, the fact that the initialing of the products, the fact that they said they never sold counterfeit products, these are all reasons that we should be able to have a trial on these matters. And with that, I submit. All right. Thank you, counsel. Thank you, Your Honor. Chung v. City of L.A. is submitted.
judges: Cudahy, Wardlaw, Fletcher W.